UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

SONY ERICSSON MOBILE COMMUNICATIONS AB,
a Corporation of Sweden
Nya Vattentornet
Lund, Sweden SE-22188

and

SONY ERICSSON MOBILE COMMUNICATIONS (USA) INC.,
a Delaware corporation
Terminus 200, Suite 600
3333 Piedmont Road, N.E.
Atlanta, GA 30305

Plaintiffs,

vs.

CLEARWIRE CORPORATION,
a Delaware Corporation
4400 Carillon Point
Kirkland, WA 98033

and

CLEARWIRE COMMUNICATIONS LLC,
a Delaware Limited Liability Company
4400 Carillon Point
Kirkland, WA 98033

Defendants.

Civil No. 1:11-CV-00048 (CMH)(TCB)

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Page

INTRODUCTION: ..... 1

STATEMENT OF FACTS. ..... 4

I. Clearwire and the Development of the Clearwire "CLEAR C Mark." ..... 4

II. SE Is Different than Clearwire. ..... 8

ARGUMENT ..... 9

I. SE Cannot Meet the Required Elements Necessary to Obtain a Preliminary Injunction. ..... 9

II. SE's Motion for Preliminary Injunction Fails Because It Cannot Prove Likelihood of Success on the Merits of Its Trademark Infringement Claim. ..... 10

A. SE Cannot Prove That It Owns a Valid and Protectable Mark. ..... 10

1. SE's Sphere in Multiple Colors are Not Distinctive. ..... 10

2. SE Present No Evidence that Its Sphere Marks Have Secondary Meaning. ..... 11

a. SE's Failure to Provide Studies of Consumer Recognition Weighs Heavily Against a Finding of Secondary Meaning ..... 12

b. SE's Sales Figures and Advertising Expenditures Are Insufficient to Prove Secondary Meaning ..... 13

c. The Remaining Perini Factors Also Weigh in Favor of SE's Mark Being Weak. ..... 14

B. SE Cannot Prove That Clearwire's Use of Its CLEAR C Mark Is Likely to Cause Confusion With SE's Mark. ..... 15

a. SE's Mark Is Weak Because It Has No Commercial Strength. ..... 16

b. The Marks Are Not Similar. ..... 17

(i) The SE Sphere Marks and the CLEAR C Mark Are Inherently Different. ..... 17

(ii) Market Use Further Distinguishes the SE Sphere Mark and CLEAR C Mark. ..... 20

c. SE Presents No Credible Evidence Clearwire Intended to Imitate SE's Mark. ..... 21

d. SE's Failure to Provide Any Evidence of Actual Confusion Is Significant and Weighs Heavily Against Likelihood of Confusion. ..... 23

        e. Confusion Is Unlikely Because Sophisticated Mobile Phone Consumers Take Reasonable Care in Choosing What Products to Purchase. ....26

f. The Remaining Likelihood of Confusion Factors Do Not Tip the Scale in SE's Favor to Create Likelihood of Success on the Merits....27

C. There Will Be No Harm to Sony Ericsson – Irreparable or Otherwise. ....27

D. The Balance of Equities Strongly Tips in Clearwire's Favor. ....28

E. There Is No Public Interest in Granting the Injunction....29

CONCLUSION....29

# TABLE OF AUTHORITIES

Page(s)

## Cases

American Chicle Company v. Topps Chewing Gum, Inc.,
208 F.2d 560 (2d Cir. 1953) .......... 22

Amstar Corporation v. Domino's Pizza, Inc.,
615 F.2d 252 (5th Cir. 1980) .......... 24

Anheuser-Busch, Inc. v. L & L Wings, Inc.,
962 F.2d 316 (4th Cir. 1992) .......... 16, 20

Brown v. Quiniou,
744 F. Supp. 463 (S.D.N.Y. 1990) .......... 12, 21, 25

CareFirst of Maryland, Inc. v. First Care, P.C.,
434 F.3d 263 (4th Cir. 2006) .......... 17, 20

Charles Jacquin Et Cie v. Destileria Serrales, Inc.,
921 F.2d 467 (3rd Cir. 1990) .......... 25

Eagle Snacks, Inc. v. Nabisco Brands, Inc.,
625 F. Supp. 571 (D.N.J. 1985) .......... 11, 12, 25

Food Fair Stores, Inc. v. Lakeland Grocery Corporation,
301 F.2d 156 (4th Cir. 1962) .......... 11

George & Company, LLC v. Imagination Entertainment Ltd.,
575 F.3d 383 (4th Cir. 2009) .......... passim

GoTo.com, Inc. v. Walt Disney Company,
202 F.3d 1199 (9th Cir. 2000) .......... 19

Grigsby & Associates, Inc. v. Rice Derivative Holdings, L.P.,
No. 00 CV 5056 (RO), 2004 WL 1078013 (S.D.N.Y. May 13, 2004) .......... 10, 18

Guess? Inc. v. Nationwide Time Inc.,
16 U.S.P.Q.2d 1804 (T.T.A.B. 1990) .......... 18

H. Jay Spiegel & Associates, P.C. v. Spiegel,
652 F. Supp. 2d 630 (E.D. Va. 2008) .......... 29

Holiday Inns, Inc. v. Holiday Out in America,
481 F.2d 445 (5th Cir. 1973) .......... 23

Hormel Foods Corporation v. Jim Henson Productions, Inc.,
73 F.3d 497 (2nd Cir. 1996) .......... 21

In re International Spike, Inc.,
190 U.S.P.Q. 505 (T.T.A.B. 1976) .......... 13

International Jensen, Inc. v. Metrosound U.S.A. Inc.,
4 F.3d 819 (9th Cir. 1993) .......... 27, 29

Jefferson Bankshares, Inc. v. Jefferson Savings Bank,
Civ. No. 89-0022-C, 1989 WL 222446 (W.D. Va. Sept. 20, 1989) ........................................ 22

Lone Star Steakhouse & Saloon v. Alpha of Virginia, Inc.,
43 F.3d 922 (4th Cir. 1995) ........................................................................................ 10, 23

Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,
507 F.3d 252 (4th Cir. 2007) ............................................................................................ 23

MicroStrategy Inc. v. Motorola, Inc.,
245 F.3d 335 (4th Cir. 2001) .............................................................................................. 9

Obama, Inc. v. FEC,
607 F.3d 355 (4th Cir. 2010) .............................................................................................. 9

Perini Corp. v. Perini Construction, Inc.,
915 F.2d 121, 125 (4th Cir. 1990) ............................................................................. passim

Petro Stopping Centers, L.P. v. James River Petroleum, Inc.,
130 F.3d 88 (4th Cir. 1997) .................................................................................. 17, 18, 24

Pizzeria Uno Corporation v. Temple,
747 F.2d 1522 (4th Cir. 1984) ..................................................................................... 16, 17

Playmakers, LLC v. ESPN, Inc.,
297 F. Supp. 2d 1277 (W.D. Wash. 2003)......................................................................... 21

Premier-Pabst Brewing Corporation v. Elm City Brewing Company,
9 F. Supp. 754 (D. Conn 1935)............................................................................................ 2

Ralston Purina Company v. Thomas J. Lipton, Inc.,
341 F. Supp. 129 (S.D.N.Y. 1972) .................................................................................... 13

Real Truth About Obama v. Federal Election Commission,
575 F.3d 342 (4th Cir. 2009) .............................................................................................. 9

Rosetta Stone Ltd. v. Google, Inc.,
730 F. Supp. 2d 531 (E.D. Va. 2010) ................................................................................ 26

Sara Lee Corporation v. Kayser-Roth Corporation,
81 F.3d 455 (4th Cir. 1996) .............................................................................................. 23

Scientific Applications v. Energy Conservation Corporation,
436 F. Supp. 354 (N.D. Ga. 1977)..................................................................................... 13

Seabrook Foods, Inc. v. Bar-Well Foods Ltd.,
568 F.2d 1342 (U.S.C.C.P.A. 1977).................................................................................. 13

Sunbeam Corporation v. Equity Industries Corporation,
635 F. Supp. 625 (E.D. Va. 1986) ............................................................................... 13, 18

Tools USA & Equipment Company v. Champ Frame Straightening Equipment, Inc.,
87 F.3d 654 (4th Cir. 1996) ........................................................................................ 23, 26

U.S. Search, LLC v. U.S. Search.com Inc.,
300 F.3d 517 (4th Cir. 2002) ............................................................................................ 12

Universal Frozen Foods Co. v Lamb Weston, Inc.,
697 F. Supp. 389 (D. Or. 1987) ........................................................................................ 15

Wiley v. American Greetings Corporation,
762 F.2d 139 (1st Cir. 1985)...................................................................................... 10, 18

Winter v. Natural Resources Defense Council,
553 U.S. 7, 129 S. Ct. 365, 172 L. Ed.
2d 249 (2008)................................................................................................................... 19

WLWC Centers, Inc. v. Winners Corporation,
563 F. Supp. 717 (M.D. Tenn. 1983)............................................................................... 13

## INTRODUCTION:

The critical indisputable fact dominating this litigation is that for over two years Clearwire's "CLEAR C Mark" has been seen by tens of millions of persons across the United States, and yet Sony Ericsson[1] presents this Court with not a shred of evidence that a single person has been confused by this mark to believe it has any association with SE. Every day from coast to coast tens of thousands of Americans drive by billboards with the CLEAR C Mark, read newspaper advertisements with the CLEAR C Mark, and by using the Internet and watching TV see scores of advertisements for the CLEAR C Mark, and yet there is no evidence that any person has been confused to believe that Clearwire, an Internet service provider, has some association with SE, a mobile phone manufacturer. It is in the face of this real world experience --where no one is confused -- that SE asks this Court to find a likelihood of confusion between two marks that no one has ever associated together.

SE's request to this Court for the extraordinary remedy of a preliminary injunction is most notable for what it lacks: Proof to meets its burden. Given the deficiencies in SE's case, the undeniable conclusions are that:

1. SE's Sphere Mark lacks secondary meaning or strength. Amazingly for a joint venture of two companies that have combined sales of over $100 billion per year, SE comes to this Court with no evidence from its own vast marketing department showing any recognition or strength of its marks nor any survey it authorized to establish this critical component to its claim.

There is no evidence of the strength of SE's Sphere Mark because it is not strong. Even assuming SE possesses no pre-existing evidence about the strength of its marks (a difficult

[1] Clearwire notes that although Plaintiffs have presented evidence that Sony Ericsson Mobile Communications AB owns the mark, they have presented no evidence that this legal entity uses the mark in the United States. Nor has SE presented any evidence as to which entity utilizes the mark in the US or which entity does business in the US. To the extent Plaintiffs' request for an injunction is based upon registered marks, and it appears to be, only the Swedish entity is a proper movant for this relief. However, given Plaintiffs' blurring of each Plaintiff's function, Clearwire will refer to them collectively as "SE" throughout.

assumption for a company its size) SE had over a year and a half (since Clearwire first used the CLEAR C Mark in SE's hometown of Atlanta, Georgia) to generate some evidence to support an assertion of secondary meaning or strength. A simple survey showing its mark to persons who could identify it as indicative of SE as the source would have been noteworthy. However, SE comes to this Court with empty hands. In reality, it brings no such evidence to this Court because the evidence does not exist and in good faith SE cannot create evidence that makes a weak mark totally devoid of secondary meaning appear to have real strength.

SE's unrecognizable mark should not be afforded protection by this Court. For over 75 years, since Premier-Pabst Brewing Corp. v. Elm City Brewing Co., 9 F. Supp. 754 (D. Conn 1935), courts have recognized that if a plaintiff "has not succeeded in the acquisition of an identity in the public eye, necessarily no act of [defendant] can operate to deceive the public … and [plaintiff] suffers no wrong because he has no legal right that is susceptible to legal injury." This rule was adopted by the Fourth Circuit in Perini Corp. v. Perini Construction, Inc., 915 F.2d 121, 125 (4th Cir. 1990), stating "[i]f a trade name has not acquired secondary meaning, the purchaser will not make an association with a particular producer and thus will not be misled by an identical or similar mark." Id. Thus here, given the dissimilar marks, SE has no claim against Clearwire.

2. The two marks are not similar. Again, SE has not presented any expert opinion or survey evidence to this Court to establish similarity, and the lack of similarity is underscored by SE's failure to provide evidence of actual confusion.

SE cannot produce any evidence of similarity and *conveniently* avoids such evidence in its brief because Clearwire identifies its CLEAR C Mark with the word "CLEAR", negating any similarity. Moreover, even absent the word "CLEAR" SE's sphere and Clearwire's sphere are no more similar than the scores of other sphere marks that exist in today's marketplace. SE would like this Court to believe that only two sphere marks exist in the world -- its mark and Clearwire's mark. SE's ostrich approach to AT&T's sphere, Microsoft's X-box sphere, Google's Chrome sphere among scores of other sphere marks does not negate their existence.

Notably, all of these marks possess the "remarkable" similarity that they all use spheres with color. For as noted in an article in Vibe magazine,[2] criticizing the Swedish Government's use of a sphere for its EU chairmanship:

> And to express all that, [Sweden] came up with a 'sphere-logo'. Another one. For those who are not yet convinced that sphere or globe logos are not particularly original and differentiating, here's sixty more

.

3. Clearwire did not intend to trade on any alleged good will of SE. SE presents no evidence of Clearwire's bad intent because none exists. Clearwire adopted a C in a sphere to symbolize the C of Clear service or Clearwire Communications LLC in a modern Internet

---

2 See http://mattus.web-log.nl/vibe_visual_brand_experie/2009/03/last-week-swede.html (for this Court's convenience, a copy of this article is attached as Exhibit J to the Declaration of Daron T. Carriero ("Carreiro Decl."), filed concurrently herewith as Exhibit 2).

world. Again, as to the sphere, it is the same reason that AT&T uses a sphere, that Microsoft's X-box uses a sphere, that Google's Chrome service uses a sphere and that scores of other trademarks incorporate spheres. It is simply comical to propose that Clearwire intended to associate itself with SE and the "famous and unique" SE Sphere Mark. For as to fame, SE's major contribution to the mobile phone market in the last two years is giving its market share to its competitors and whose "unique" sphere is as special as any other round ball.

4. This Court has been presented no evidence that any one, any place, any where, at any time has actually been confused. SE brings no evidence of actual confusion because, like Clearwire, it possesses none.

Here, giving every benefit of the doubt to the evidence presented by SE to this Court, millions of Americans have seen these two non-identical marks, and yet the record is devoid of any evidence of actual confusion. SE does not need an injunction to prevent a likelihood of confusion, the real world – based on the differences between these marks and the weakness of SE's Sphere Mark – has already protected it from any likelihood of confusion.

Where, as here, two marks have failed to result in any confusion, and the differences between the marks protect each from being associated with the other injunctive relief is not proper. Therefore, SE's request for injunctive relief to prevent Clearwire from using its CLEAR C Mark should be denied.

## STATEMENT OF FACTS.

### I. Clearwire and the Development of the Clearwire "CLEAR C Mark."

Clearwire, headquartered in Kirkland, Washington, is a leading provider of wireless broadband services to businesses and consumers. Since 2004, Clearwire has been in the business of selling a unique suite of high speed, wireless broadband Internet services. Today, from its nationwide network built for robust data speed, it provides super fast, "take-it-with-you" internet. Clearwire's vast spectrum holding enables it to provide service that is fast and less costly than its competitors in the mobile carrier space. Declaration of Thomas Enraght-Moony ("Moony Decl."), filed concurrently herewith as Exhibit 1, ¶ 3.

Clearwire's 4G network of next generation wireless broadband communications is currently available in over 70 metropolitan markets across the U.S. where over 100 million people live, and Clearwire continues to expand its 4G coverage. Clearwire's open all-IP network, combined with significant spectrum holdings, provides an unprecedented combination of speed and mobility to deliver home and on-the-go broadband access.  The company markets its 4G service through its own brand called CLEAR as well as through its wholesale relationships with Sprint, Comcast, Time Warner Cable and others.  Id. at ¶ 4.

Prior to December 2008, Clearwire provided Internet service via a network referred to as its "Expedience" network, and marketed its products via a mark that was simply its name: "CLEARWIRE."  However, in late 2008, Clearwire launched its first 4G WIMAX broadband service as "CLEAR".  Clearwire's CLEAR branded 4G WiMAX network was a significant change to what Clearwire had historically offered and gave customers the speed they needed to stream movies, play online games, video chat on the go and take full advantage of the power of the Internet from any location.  Id. at ¶ 5.

In 2008, to reflect its new business, Clearwire began developing a new branding strategy. Id. at ¶ 6.  This included the adoption of a new mark consisting of the word "CLEAR" coupled with a white 3D sphere with a stylized green "C" on it ("CLEAR White C Mark"):



Id.

The CLEAR White C Mark was first launched in Portland, Oregon in December 2008. Later, in June 2009, in Atlanta, Georgia, Clearwire additionally began using a slightly varied version of the CLEAR White C Mark in which the colors were inverted so that the sphere was green and the "C" on the sphere was white ("CLEAR Green C Mark"):



Id. at ¶ 7.  Clearwire created this version of the mark to insure visibility of the mark on white backgrounds and to enhance the visual appearance of the mark.  During 2010, Clearwire decided that all new materials would utilize only Clearwire's CLEAR Green C Mark to afford greater uniformity and brand consistency on a going forward basis.  Id. at ¶ 8.  Finally, in October 2010, Clearwire released a slightly enhanced version of its CLEAR Green C Mark:



Id. at ¶ 9.

The C on the CLEAR C Mark identifies "Clear" service or "Clearwire Communications." Id. at ¶ 10.  Clearwire chose to use the color green in its new mark for two reasons.  First, Clearwire's color had historically been green.  Id.  Second, a survey of Clearwire's direct competitors (other major mobile phone carriers such as AT&T, Verizon, T-Mobile, and Sprint) indicates that using green would in fact *distinguish* Clearwire from its actual competition.  Id. at ¶ 10, Ex. A.

Since its Atlanta launch in June 2009, Clearwire has continued to expand its superior service and its new brand, using the CLEAR C Mark,[3] in major metropolitan markets throughout the United States, including New York, Las Vegas, Washington D.C., Los Angeles, and over 70 different markets.  Id. at ¶ 11.  Clearwire's marketing campaign consists of billboards, TV ads, radio ads, in-store signs, Internet marketing and direct mail campaigns.  In 2010, Clearwire spent over $200 million on its advertising campaign, featuring its CLEAR C Mark.  Id. at ¶ 12.  The

---

[3]  Clearwire has used its CLEAR White C Mark, its CLEAR Green C Mark and its enhanced CLEAR Green C Mark in different venues in the United States during the last 2 years.  As SE refers to all three marks as infringing throughout its papers, without making any true distinction between them, Clearwire will collectively refer throughout to all three versions as the "CLEAR C Mark."  However, as was explained to SE during the negotiations whereby Clearwire attempted to avoid the significant costs of litigation, and because of the factors noted above, Clearwire does not intend to continue any use of the CLEAR White C Mark.

sphere portion of the CLEAR C Mark is not used by itself, rather in its appearance in Clearwire's marketing campaign and on the goods Clearwire sells, it is paired with the word "CLEAR." Id. The scope of Clearwire's advertising and marketing campaign means that millions of people have been exposed to the CLEAR C Mark. Id.

The CLEAR C Mark is the logo for Clearwire's CLEAR service and is at the heart of our marketing efforts for the CLEAR brand. Declaration of Missy Walker ("Walker Decl."), filed concurrently herewith as Exhibit 3, ¶ 3.

No piece of communication that touches Clearwire's consumers leaves the company without the CLEAR C Mark as a prominent feature. Id at ¶ 4. The CLEAR C Mark, is truly one of the most recognizable assets for the CLEAR brand. Id. The CLEAR C Mark graces everything from promotional items and uniforms, to CLEAR products such as USBs, mobile hot spots and home modems, over 170 CLEAR retail stores, approximately 3000 authorized retailers, kiosks in over 2,000 national retailers such as Best Buy, Frye's and Radio Shack, the clear.com web site and fan pages on Facebook and Twitter, as well as Clearwire's extensive public relations, consumer advertising and direct mail campaigns. Id.

In Clearwire's mature markets where we have been marketing our services for 6+ months, the CLEAR brand enjoys between 55-77% brand awareness, rivaling its larger competitors, such as Sprint, Verizon, AT&T and other mobile Internet service providers. Id. at ¶ 5.

While Clearwire values its CLEAR C Mark as priceless, in 2010 it spent over $200,000,000 marketing the CLEAR brand to customers. Additionally, great interest in Clearwire's brand and resulting media coverage about the CLEAR retail brand has garnered a minimum value of $31,000,000 that were generated from its efforts. Id. at ¶ 6.

II. SE Is Different Than Clearwire.

Sony Ericsson Mobile Communications AB is a corporation organized under the laws of Sweden with a wholly owned United States subsidiary, Sony Ericsson Mobile Communications (USA), Inc., based in Atlanta, Georgia. Mem. at 4. Sony Ericsson Mobile Communications AB was established in 2001 and is a 50/50 joint venture of two large companies, Sony Corporation and Telefonaktiebolaget LM Ericsson. Id. In stark contrast to Clearwire, SE does not offer Internet service. Moony Decl. ¶ 14. Rather, SE is a manufacturer of mobile phones and related telephone accessories. Id.[4] Due at least in part to the unappealing nature of its products,[5] SE has a small, and decreasing, percentage of the worldwide mobile phone market. Specifically, in 2008 SE had 7.6% of the global mobile phone market share. Carreiro Decl. Ex. C. In 2009 this market share dropped to 4.5% and to 3% in 2010, a 60% drop in market share in two years. Id. at Exs. C-D.

SE has its ubiquitous sphere registered with a different core in almost every color of the rainbow. Id. at Ex. E; see also Carreiro Decl. ¶ 9, Exs. F, O. [6] So, far example, here are some of the Sony Sphere Marks iterations:

[4] It must be noted that no where in SE's papers does it identify a single product or service that both companies market. The indisputable fact is that not only do SE and Clearwire not compete against each other in any market, SE mobile phones do not operate on Clearwire's network because they are not technologically equipped to support Clearwire's network.

[5] For example, in reviewing SE's phone, Gizmag.com stated "If Sony Ericsson could iron out the kinks in their software, and improve format …, but as it stands, it's really hard to recommend." Carreiro Decl. Ex. A. Likewise, TechRadar.com stated "After a disappointing 2009 for Sony Ericsson, with the likes of the Satio failing to live up to its flagship billing, the Swedish-Japanese alliance is back with its first Android proposition - [T]he phone came in for review, and we were disappointed. Laggy software, only Android 1.6 and a somewhat baffling system made it hard to see what had happened with Sony Ericsson … - if you don't know how to kill background applications, then you'll downright hate the X10 at times. Id. at Ex. B.

[6] Collectively these marks are referred to herein as the SE Sphere Mark

This sphere is almost always used in connection with the words "Sony Ericsson." See, e.g., Carreiro Decl. Exs. G-I (comparisons of SE's and Clearwire's products, packaging, and marketing).

## ARGUMENT

### I. SE Cannot Meet the Required Elements Necessary to Obtain a Preliminary Injunction.

In order to obtain a preliminary injunction against Clearwire, SE must prove that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in SE's favor; and (4) an injunction is in the public interest. Real Truth About Obama v. Federal Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds by Real Truth About Obama, Inc. v. FEC, 607 F.3d 355 (4th Cir. 2010). To meet its burden, SE must satisfy all four requirements. Id. Moreover, the Fourth Circuit has noted that a plaintiff in a trademark case must meet a *higher threshold* to satisfy its burden for a preliminary injunction. Specifically, the court in MicroStrategy Inc. v. Motorola, Inc., 245 F.3d 335 (4th Cir. 2001), held:

> In trademark cases, a plaintiff's burden may be even greater. As we noted in *Direx*, the foremost trademark authority has stated that when the hardship balance does not tip decidedly or significantly in favor of the plaintiff, then the plaintiff must prove the probability (not mere possibility) of success on the merits; in other words, ***the plaintiff must have a very clear and strong case.*** [T]o doubt is to deny; thus, if there is doubt as to the probability of plaintiff's ultimate success on the merits, the preliminary injunction must be denied.

Id. at 340 (emphasis added and internal citations and quotation marks omitted.)

As detailed below, SE cannot prove that the balance of hardship tips in its favor, let alone tips "decidedly" in its favor. Therefore, SE bears a heightened burden to prove the likelihood of success on the merits -- a burden it cannot meet. Moreover, SE's arguments regarding the remaining necessary elements – irreparable harm and an injunction being in the public's interest – are solely premised on SE's flawed claim that it would likely succeed on the merits. Here too, SE falls far short of meeting its substantial burden. Thus, SE cannot meet any of the elements

for this extraordinary relief, and accordingly, its motion for preliminary injunction should be denied.

II.   SE's Motion for Preliminary Injunction Fails Because It Cannot Prove Likelihood of Success on the Merits of Its Trademark Infringement Claim.

To prevail on its trademark infringement claim, SE must show "(1) evidence of ownership of a valid and protectable mark; (2) evidence of the use of the mark by an infringer; and (3) evidence of likelihood of confusion." Lone Star Steakhouse & Saloon v. Alpha of Va., Inc., 43 F.3d 922, 930 n.10 (4th Cir. 1995). SE fails to prove that it has a valid and protectable mark and that there is likelihood of confusion.[7] Since SE cannot meet the required elements of its trademark claim, it fails to meet its heightened burden to show its likelihood of success on the merits of its claim. Therefore, SE's request for preliminary injunction should fail.

A.   SE Cannot Prove That It Owns a Valid and Protectable Mark.

1.   SE's Sphere in Multiple Colors are Not Distinctive.

SE cannot meet its burden to show that its marks -- spheres in various colors -- are valid and protectable.[8] The shape of SE's Mrk is not sufficiently distinctive to warrant protection. In fact, courts have held that ordinary geometric shapes are so common in the marketplace that they are considered non-distinctive and entitled to a narrower scope of protection. See, e.g. Wiley v. American Greetings Corp., 762 F.2d 139, 142 (1st Cir. 1985). "Under trademark law, geometric shapes or designs contained in a logo are generally not considered inherently distinctive and are protectable only upon proof of secondary meaning." Grigsby & Assocs., Inc. v. Rice Derivative Holdings, L.P., No. 00 CV 5056 (RO), 2004 WL 1078013, at *2 (S.D.N.Y. May 13, 2004). As discussed in detail below, there is no evidence that SE's Sphere Marks have acquired any secondary meaning.

---

[7]   Clearwire does not dispute that it is using its own CLEAR C Mark. Obviously, it does deny that it is using any mark associated with SE.

[8]   There is no dispute that SE's Sphere Marks are not incontestable and are not entitled to any presumptions afforded incontestable marks.

Moreover, SE's claim that its sphere is unique because of its green color is belied by its own actions in using its mark in multiple colors. Carreiro Decl. Exs. E-F, O. This self-defeating action demonstrates that the distinctive feature of SE's Sphere Mark is not in its color.[9] Thus, when honestly evaluated, SE's claimed mark is a sphere of any color, which is so vague as to be meaningless. Consequently, SE's Sphere Mark is not inherently distinctive, and combined with their lack of secondary meaning, do not warrant protection.

2. SE Presents No Evidence That Its Sphere Mark Has Secondary Meaning.

"Secondary meaning exists if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." Food Fair Stores, Inc. v. Lakeland Grocery Corp., 301 F.2d 156, 160-61 (4th Cir. 1962). Secondary meaning in a trademark is "the power of a name to…symbolize a particular business." Perini, 915 F.2d at 125. "If a trade name has not acquired secondary meaning, the purchaser will not make an association with a particular producer and thus will not be misled by an identical or similar mark." Id.

The plaintiff bears the burden of proving secondary meaning. Id. at 125-26. "The burden is ordinarily considered a heavy one, since one result may be to deprive the public of the free use of the particular term in relation to certain products." Eagle Snacks, Inc. v. Nabisco Brands, Inc., 625 F. Supp. 571, 582 (D.N.J. 1985). Proof of secondary meaning entails a rigorous evidentiary standard. Perini, 915 F.2d at 125. The Fourth Circuit in Perini established the following six factors for a court to consider in assessing the acquisition of secondary meaning: "(1) the plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark" (the "Perini Factors"). Id.

---

[9] It is noteworthy that in the face of SE's attempt to monopolize the color spectrum, Clearwire only identifies with the color green.

a.      SE's Failure to Provide Studies of Consumer Recognition Weighs
        Heavily Against a Finding of Secondary Meaning.

Of the Perini Factors, the second one, consumer studies linking the mark to a source (also

known as surveys), is the most indicative of secondary meaning.  Consumer studies are

"generally thought to be the most direct and persuasive way of establishing secondary meaning."

George & Co., LLC v. Imagination Entm't Ltd., 575 F.3d 383, 395-96 (4th Cir. 2009); U.S.

Search, LLC v. U.S. Search.com Inc., 300 F.3d 517, 526 n.13 (4th Cir. 2002).  Therefore, the

Fourth Circuit has held that "[t]he absence of such evidence is telling."  George & Co., 575 F.3d

at 395-96 (holding that there was no meaningful evidence demonstrating that the public

associated the mark with plaintiff where there were no consumer studies).  Other courts likewise

draw negative inferences from a plaintiff's lack of consumer studies.  Specifically, courts have

held that "[f]ailure of a trademark owner to run a survey to support its claims of brand

significance and/or likelihood of confusion, where it has the financial means of doing so, may

give rise to the inference that the contents of the survey would be unfavorable, and may result in

the court denying relief."  Eagle Snack, 625 F. Supp. at 583 (denying plaintiffs motion for

preliminary injunction).  Further, courts have indicated that where, as in the present case, the

plaintiff has less than a clear case, a survey is necessary to prove secondary meaning.  Brown v.

Quiniou, 744 F. Supp. 463, 470 (S.D.N.Y. 1990) (holding that "where the other evidence of

consumer recognition is hardly overwhelming, the absence of survey evidence weighs heavily

against plaintiffs' position.").

SE has not submitted any consumer studies connecting its mark to its source.  Since SE is

a multi-billion company with significant resources to conduct such studies or surveys, the

inference is that the result of such a study would be unfavorable.  Since SE has also failed to

present any other strong evidence of consumer recognition of its mark, its failure to provide any

survey evidence weighs heavily against a finding of secondary meaning.

b.   SE's Sales Figures and Advertising Expenditures Are Insufficient to Prove Secondary Meaning.

SE's sales figures and advertising expenditures do not establish secondary meaning. "While sales success and advertising outlays are factors to be considered on the secondary meaning issue, they only peripherally relate to public perception of the product's appearance." Sunbeam Corp. v. Equity Indus. Corp., 635 F. Supp. 625, 629-30 (E.D. Va. 1986); Seabrook Foods, Inc. v. Bar-Well Foods Ltd., 568 F.2d 1342, 1345 (U.S.C.C.P.A. 1977) (sales volume, though relevant, is not necessarily sufficient to indicate recognition of the mark by purchasers as an indication of the source); In re Int'l Spike, Inc., 190 U.S.P.Q. 505, 507 (T.T.A.B. 1976) (same); Scientific Applications v. Energy Conservation Corp., 436 F. Supp. 354, 361 (N.D. Ga. 1977) (advertising expense relevant but will not, standing alone, establish secondary meaning). While product sales may establish popularity, popularity is insufficient to establish secondary meaning. Ralston Purina Co. v. Thomas J. Lipton, Inc., 341 F. Supp. 129, 134 (S.D.N.Y. 1972) (finding no secondary meaning even where product was biggest seller of moist cat food). Likewise, SE's reliance on its advertising expenditures fails to recognize that such expenditures merely indicate an effort to establish secondary meaning; they do not, however, determine the success of those efforts. Id. (finding that $4 million spent promoting the mark was insufficient to establish secondary meaning). Additionally, where advertising expenditures are required to "merely survive" in the competitive market, advertising expenditures cannot be used to prove secondary meaning. WLWC Ctrs., Inc. v. Winners Corp., 563 F. Supp. 717, 724 (M.D. Tenn. 1983).

As explained above, even if SE had impressive advertising and sales figures, those would not be adequate to prove secondary meaning of SE's Mark. Moreover, the advertising and sales figures that SE submits, when viewed in the market, are hardly notable. SE represents that it "had over $2.5 billion worth of global sales in the third quarter of 2010 and has sold nearly 32 million phones in the US." Declaration of Justin Pierce ("Pierce Decl."), filed concurrently with Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction ("Mem.") as

Exhibit 1, at ¶ 7.[10] While this may sound substantial in a vacuum, SE only has a small and rapidly shrinking marketshare. Carreiro Decl. Exs. C-D. Similarly, the amount SE claims to have spent on advertising in 2009, $26 million, is a relatively low number for a mobile communication business. In comparison, Clearwire spent over $200 million on advertising in 2010. Moony Decl. ¶ 12. Further, in light of SE's small and shrinking market share in the highly competitive mobile phone market, the $26 million it spent in advertising was necessary merely to attempt to survive. Such figures do not prove secondary meaning.

c. The Remaining Perini Factors Also Weigh Agaisnt a Finding of Secondary Meaning.

SE has not presented any evidence to support the other Perini Factors. SE does not submit even one instance of ***unsolicited*** media coverage of its business. Rather, it only points to media coverage of the tennis tournament for which it is the named sponsor: the Sony Ericsson Open. This media coverage does not provide support for Perini's media coverage factor because 1) it is not unsolicited (rather it is advertising, in which media coverage is the very purpose of the sponsorship) and 2) the media coverage cited by SE is of the tennis tournament itself, rather than SE's business.

SE likewise does not present any relevant evidence to support the Perini Factor regarding attempts to plagiarize. This factor assesses whether there were prior attempts to plagiarize before the defendant's alleged infringement. George & Co., 575 F.3d at 396 (noting no prior attempts to plagiarize before the defendant's activities). SE fails to cite a single additional case it has brought for an alleged infringement of its "distinctive" sphere. This is most telling, when viewed against the 60 plus sphere marks put forward above. SE's sole proof of attempts to plagiarize is its current trademark dispute with Clearwire, which does not provide evidence of

[10] The "evidence" SE submits in support of its sales and advertising figures is questionable. For example, though the declaration supporting the allegation states that the Swedish corporate parent (Sony Ericsson Mobile Communications, AB) spent $26 million on advertising in 2009 (Pierce Decl. ¶ 4), the brief incorrectly claims this is a US spend.

secondary meaning. Such circuitous argument does not meet the standard put forward by the Fourth Circuit in Perini.

SE also attempts to show that it has exclusive use of the color green in the mobile communications business. To the contrary, that same shade of green is used by several other mobile phone companies, including SE's direct competitor HTC, as well as Android and Cricket. Carreiro Decl. Ex. N. Moreover, SE itself does not even exclusively use the color green. Rather, as shown above, SE uses its mark in a spectrum of colors. Id. at Exs. E-F, O. Therefore, SE's claim to exclusive rights to the color green in the mobile communications market lacks merit.

In assessing all of the Perini Factors, it is evident that SE has failed to meet its burden to prove that its mark has acquired secondary meaning. As explained by McCarthy, the foremost trademark authority, and consistent with the Fourth Circuit in Perini, "the basic principle is that if there is no secondary meaning, there is no mark to protect and confusion is not possible." 2 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 15:11 (4th ed. 2010); see also Universal Frozen Foods Co. v Lamb Weston, Inc., 697 F. Supp. 389, 394-95 (D. Or. 1987) ("proof of secondary meaning is a condition precedent to any discussion of likely confusion …. [T]o be confused, the customer must have some 'brand' in mind that he or she is looking for, and buys the junior user's product under the confused impression that it is a product of the senior user."). As SE's mark has no secondary meaning, it cannot be confused with any other mark.

SE's infringement claim and request for a preliminary injunction fail because SE does not have a valid and protectable mark. The evidence demonstrates that SE's Mark is not incontestable, is not distinctive, and has no secondary meaning. Absent admissible proof on these critical issues, SE's claim for relief must fail.

### B. SE Cannot Prove That Clearwire's Use of Its CLEAR C Mark Is Likely to Cause Confusion With SE's Mark.

Neither can SE prove the third factor necessary to establish likelihood of success on the merits: that there is a likelihood of confusion between Clearwire's CLEAR C Mark and SE's Mark. In assessing whether such confusion exists, courts look to "how the two parties actually

use their mark in the marketplace to determine whether the defendant is likely to cause confusion." George & Co., 575 F.3d at 393. The Fourth Circuit examines nine factors to determine likelihood of confusion: (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public. Id.

Not all of these enumerated factors are of equal importance. Id. Some factors – strength of mark and actual confusion – are considered of "paramount" importance and weigh heavily in the determination of likelihood of confusion. Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984), (holding that strength of mark is a "paramount factor"); George & Co., 575 F.3d at 393 (holding that actual confusion is "most significant"). Other factors are not always relevant, or do not carry much weight even if they are. Anheuser-Busch, Inc. v. L & L Wings, Inc., 962 F.2d 316, 320 (4th Cir. 1992); George & Co., 575 F.3d at 397, 400 (holding that there was no likelihood of confusion even where the factors for similar goods, similar facilities and similar advertising weighed in favor of likelihood of confusion). Moreover, these factors are not a rigid formula; rather they are "only a guide- a catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion" Anheuser-Busch, 962 F.2d at 320.

a. SE's Mark Is Weak Because It Has No Commercial Strength.

"The first and paramount factor" in determining likelihood of confusion is the distinctiveness or strength of the mark. Pizzeria Uno, 747 F.2d at 1527. The stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark. George & Co., 575 F.3d at 393. Strength of mark is determined by two factors: a mark's conceptual strength and its commercial strength. Id. at 397. Regardless of a mark's conceptual strength, that is only the first step in the analysis. Id. at 395. The second and ultimately more

important question is the commercial strength of the mark. This is because the "[s]trength of a mark ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source." Petro Stopping Centers, L.P. v. James River Petroleum, Inc., 130 F.3d 88, 93 (4th Cir. 1997). Therefore, lack of commercial strength renders a mark weak, notwithstanding having a conceptually strong mark. George & Co., 575 F.3d at 396*;* Petro, 130 F.3d at 93. Thus, regardless of the conceptual strength of SE's Mark, it must be able to prove that its mark has commercial strength to be considered strong, and SE simply cannot establish this. A mark's commercial strength is a concept similar to the "secondary meaning" inquiry considered in evaluating a mark's validity. CareFirst of Md., Inc. v. First Care, P.C., 434 F.3d 263, 269 n.3 (4th Cir. 2006). Without repeating myriad reasons for why SE's Sphere Mark lacks secondary meaning, Clearwire submits the same identical analysis proves SE's Sphere Mark is weak.

Additionally, SE does not present evidence to show exclusivity of use. "The frequency with which a term is used in other trademark registrations is indeed relevant to the distinctiveness inquiry of the first likelihood of confusion factor." Petro Stopping Centers, 130 F.3d at 93 (citing Pizzeria Uno Corp., 747 F.2d at 1530-31); see also Petro Stopping Centers, 130 F.3d at 94 (holding that evidence of third-party registrations are "relevant to prove that some segment of the composite mark which both contesting parties use has a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that the segment is relatively weak"). Without repasting the 60 spheres shown above, Clearwire submits that a 3D sphere is used by countless companies. See, e.g., Carreiro Decl. Exs. J-M, P. Thus, SE has failed to demonstrate exclusive use of the sphere mark it attempts to claim as its own.

b. The Marks Are Not Similar.

(i) The SE Sphere Mark and the CLEAR C Mark Are Inherently Different.

In assessing similarity of marks, the court focuses on the marks' dominant features to determine whether there is a similarity in sight, sound, or meaning that would result in confusion.

George & Co., 575 F.3d at 396. Although the court generally focuses on the dominant portions of parties' marks and weighs similarities more heavily than differences, differences are still a necessary part of the court's analysis. Petro, 130 F.3d at 94. Ordinary geometric shapes are so common in the marketplace that they are considered non-distinctive and entitled to a narrower scope of protection. Wiley, 762 F.2d at 142; Grigsby, 2004 WL 1078013 at *2 ("Under trademark law, geometric shapes or designs contained in a logo are generally not considered inherently distinctive and are protectable only upon proof of secondary meaning."); see also Carreiro Decl. Exs. J-M, P. Where the only similarity between two marks is a common basic shape (as in this case, a three dimensional sphere), there is no likelihood of confusion. Guess? Inc. v. Nationwide Time Inc., 16 U.S.P.Q.2d 1804, 1806 (T.T.A.B. 1990).

The differences between the SE Sphere Mark and the CLEAR C Mark "are such that it is totally unlikely that an appreciable number of ordinarily prudent purchasers [could] be misled, or indeed simply confused, as to the source" of their respective services or products. Sunbeam, 635 F. Supp. at 632.[11] The dominant features in the CLEAR C Mark are (1) the word "CLEAR" and (2) the stylized "C." SE uses its name, Sony-Ericsson, with a cutaway/ orb-within-an-orb design without stylized lettering[12]. See Moony Decl. ¶ 15, Ex. B.

[11] And as noted throughout this brief, this lack of similarity also probably explains that despite millions of persons viewing these marks, not a single instance of actual confusion has been presented by SE.

[12] Clearwire notes that the name of SE's tennis tournament that SE makes great notice of is the **Sony-Ericsson Open** not the Open.

SE's attempts to analogize the marks at issue in this case to those at issue in GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199 (9th Cir. 2000) , abrogated on other grounds by Winter v. Natural Res. Def. Council, 553 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008), is baseless. At issue in GoTo.com were two logos containing the same letters, in the same font, with multiple identical shapes and colors in identical configurations. Notably, SE does not present to this Court the marks at issue in GoTo.com. Clearwire submits that this was not mere oversight, but that any reasonable viewing of the similarity of the marks in that case quickly distinguish it from the case at bar Since viewing the marks at issue in GoTo.com makes it immediately clear that the Ninth Circuit's similarity analysis is inapposite in the present case:

Thus in contrast the marks in dispute here contain completely different words in different fonts and different colors.

SE also complains that Clearwire's use of the color green is too similar to the color of SE's Mark. In making this argument, SE ignores the fact that SE uses its sphere mark in almost every color of the rainbow. Carreiro Decl. Exs. E-F, O.[13] In fact, as a review of the below indicates, though more similar, SE has failed to complain about any of the following

---

[13] Given its attempted over-reaching arguments in this case, Clearwire believes that regardless of the color used by it in its CLEAR C Mark, SE would argue that this color was too similar to the SE Mark and that this Court would be faced with "the same case in a different color."



Therefore, the similarities of using the color green should not be given any weight.

        (ii)      Market Use Further Distinguishes the SE Sphere Mark and CLEAR C Mark.

Similarity is not considered in the abstract or in isolation; rather, a court must view marks as they are actually used in business and in the same context in which consumers would see the marks in the marketplace.  CareFirst, 434 F.3d at 267 ("a court does not indulge in a prolonged and minute comparison of the conflicting marks in the peace and quiet of judicial chambers, for this is not the context in which purchasers are faced with the marks.  Rather, we look to how the two parties actually use their marks in the marketplace to determine whether the defendant's use is likely to cause confusion.") (internal citations and quotations omitted); Anheuser-Busch, 962 F.2d at 319 ("we must examine the allegedly infringing use in the context in which it is seen by the ordinary consumer … as a whole as sold in the marketplace").  The Fourth Circuit has held that "a comparison of … two marks alone is insufficient if the marks have different appearances in the marketplace."  CareFirst, 434 F.3d at 271.

A court must consider whether disputed marks are paired with company names or other distinguishing trade symbols in the marketplace.  CareFirst, 434 F.3d at 271 ("If one of two similar marks is commonly paired with other material, that pairing will serve to lessen any confusion that might otherwise be caused by the textual similarity between the two marks.").  Courts have found otherwise similar marks to be dissimilar under this factor based on such pairings.  See id. at 272 (finding no similarity and no likelihood of confusion where one of the marks at issue was almost always paired with Blue Cross Blue Shield language in the

marketplace); George & Co., 575 F.3d at 397 ("The names of both [plaintiff] and [defendant] appear on their respective packaging as the source of their respective goods. In short, a consumer . . . examining the marks side-by-side unquestionably would conclude that the two marks are quite different."); Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 503-04 (2nd Cir. 1996) (affirming denial of permanent injunction and holding that there was no likelihood of confusion between two marks that, as used in the marketplace, were placed next to other identifying but dissimilar symbols); Playmakers, LLC v. ESPN, Inc., 297 F. Supp. 2d 1277, 1285-86 (W.D. Wash. 2003) (denying motion for preliminary injunction because, among other things, "ESPN's use of its house mark 'ESPN' in close proximity to the contested mark . . . *decreases* the likelihood of confusion.") (emphasis in original). It is common practice for companies to display their logos in connection with their trade name, since the logo alone may not be sufficient to indicate the source of the products. Compare Carreiro Decl. Ex. J with Carreiro Decl. Ex. L.

The manner in which the SE Sphere Mark and the CLEAR C Mark appear in the marketplace distinguish them beyond doubt. Both companies pair their design marks with their company names on actual products, on packaging, and in marketing materials.[14] See Carreiro Decl. Exs.G-I (comparisons of Clearwire's and SE's products, packaging, and marketing); When viewing these marks as customers actually see them in the marketplace, particularly when paired with "CLEAR" and "Sony-Ericsson" a reasonable purchaser would unquestionably conclude that the two marks are associated with their respective owners and not with the other company.

c. SE Presents No Credible Evidence Clearwire Intended to Imitate SE's Mark.

"In the absence of evidence of bad faith, courts ordinarily presume the defendant acted in good faith." Brown, 744 F. Supp. at 472. To find intent, a court looks for "evidence of a

[14] As explained above when analyzing the lack of secondary meaning and the strength of the sphere mark, absent SE's placement of the words "Sony Ericsson" on the product and the packaging there is no proof that anyone would ever recognizer the product or package as being associated with SE.

deliberate intent to imitate another's mark."  American Chicle Co. v. Topps Chewing Gum, Inc., 208 F.2d 560, 563 (2d Cir. 1953) (Hand, J.); see also George & Co., 575 F.3d at 397 (holding no intent where plaintiff presented "no meaningful evidence" that defendant wanted to capitalize on plaintiff's mark); Jefferson Bankshares, Inc. v. Jefferson Sav. Bank, Civ. No. 89-0022-C, 1989 WL 222446, at *9 (W.D. Va. Sept. 20, 1989) (finding no intent to confuse despite defendant's CEO's comment that "if we're compared with someone, it certainly doesn't hurt to be compared with a well-run, well-managed bank that has a good reputation.").  "Knowledge of another's goods is not the same as an intent to mislead and cause consumer confusion." George & Co., 575 F.3d at 398.  In determining intent, a court will consider whether a defendant had valid reasons for choosing its mark.  Id. at 398 (in finding no intent, court noted that defendant "understandably" chose its mark because it succinctly described how the product, a game, was played).

SE has not presented any evidence to indicate that Clearwire intended to imitate SE's Mark.  Rather, all of the evidence proves that Clearwire had legitimate business reasons for choosing its mark, which had nothing to do with SE.  Moony Decl. ¶ 10.  Further, Clearwire chose the color green because Clearwire had historically had green as its brand color and as way to *distinguish* itself from its *actual* competitors, carriers like AT&T, Sprint, Verizon and T-Mobile, not phone manufacturers like SE.  Id. at ¶ 10, Ex. A.[15]

SE attempts to prove intent solely by the reasoning that since the two marks are similar, Clearwire must have intended to copy SE.  This argument is flawed for two reasons.  First, as discussed above, SE and Clearwire's marks are not similar.  Second, courts have criticized inferring the intent to confuse from the similarity of the marks:

> [The] argument is circular.  It argues that confusing similarity of the marks is proved by the defendants' intent to confuse the public and that the defendants' intent to confuse the public is proved by the confusing similarity of the marks.

---

[15] Clearwire's lack of intent is consistent with the weakness of SE's Sphere Mark.  As the SE Sphere Mark does not have any strength, copying the unrecognizable SE Sphere Mark would not allow Clearwire to trade on any of SE's non-existent goodwill.

> The obvious flaw in the argument is that it requires the court to assume that which is to be proved.

Holiday Inns, Inc. v. Holiday Out in Am., 481 F.2d 445, 449 (5th Cir. 1973). SE has failed to present any evidence of intent and therefore this factor also weighs against likelihood of confusion.

d. SE's Failure to Provide Any Evidence of Actual Confusion Is Significant and Weighs Heavily Against Likelihood of Confusion.

The actual confusion factor has been viewed by the Fourth Circuit as the "most important" factor in a likelihood of confusion analysis. George & Co., 575 F.3d at 398. This is because the best evidence of likelihood of confusion is evidence of actual confusion. Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc., 87 F.3d 654, 660 (4th Cir. 1996). Moreover, because actual confusion evidence is the most compelling evidence of likelihood of confusion, the actual confusion factor is entitled to substantial weight. Lone Star Steakhouse, 43 F.3d at 937.

"Actual confusion can be demonstrated by both anecdotal and survey evidence." George & Co., 575 F.3d at 398. To show actual confusion, SE carries the burden to put forth evidence of confusion. See e.g., Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 466-67 (4th Cir. 1996) (overwhelming anecdotal evidence and survey evidence of actual confusion provided by plaintiff; finding of infringement); Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 263 (4th Cir. 2007) (plaintiff provided very little anecdotal evidence, and no survey evidence, of actual confusion, and court found this factor weighed heavily in favor of defendant; finding of no infringement). Failure to show actual confusion "weighs heavily" against a likelihood of confusion. George & Co., 575 F.3d at 399.

Therefore, to actually prove a likelihood of confusion between the SE Sphere Mark and the CLEAR C Mark, SE should have submitted anecdotal and/or survey evidence of actual confusion. Yet, SE provides no evidence of confusion whatsoever. The complete absence of anecdotal evidence is especially telling in light of the fact that the CLEAR C Mark has been in

use for over two years and has been viewed by tens of millions of people.[16] Since December 2008, the CLEAR C Mark graces everything from promotional items and uniforms, to CLEAR products such as USBs, mobile hot spots and home modems, over 170 CLEAR retail stores, approximately 3000 authorized retailers, kiosks in over 2,000 national retailers such as Best Buy, Frye's and Radio Shack, the clear.com web site and fan pages on Facebook and Twitter, as well as Clearwire's extensive public relations, consumer advertising and direct mail campaigns. Walker Decl. ¶ 4. Clearwire has spent hundreds of millions of dollars in promotion of its products and services with its mark, which has resulted in tens of millions of consumers that have viewed the CLEAR C Mark. Moony Decl., ¶ 12. Specifically, the CLEAR C Mark has been promoted in over 70 major metropolitan areas across the United States, such as Los Angeles, New York City, Washington, D.C. , San Francisco, Chicago, Portland, and Atlanta. Id. at ¶ 11. In fact, SE's own brief argues:

> Defendants have utilized an aggressive, visual advertising campaign using their [Clear C Mark] in major cities throughout the country…. Defendants' [Clear C Marks] have been seen on television, on the Internet, on Defendants' brochures, in Defendants' stores and in major retailers nationwide such as Best Buy and Radio Shack.

Mem. at 13-14.

SE's brief also states that it sold over 3.5 million phones in the US in 2009 and 2010 and that Clearwire has over 2.8 million customers. Mem. at 7, 9. It is in the face of this prolific marketing footprint that SE fails to present even a single piece of anecdotal evidence showing actual confusion between SE's Sphere Mark and the CLEAR C Mark. SE's failure to uncover instances of actual confusion "creates a 'presumption against likelihood of confusion in the future.'" Petro, 130 F.3d at 95 (quoting Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 263 (5th Cir. 1980)).

---

[16] Though Clearwire admits that it possesses no such evidence, it believes it safe to assume that at least some of these tens of millions of persons actually at some point owned an SE mobile phone.

Considering the absence of any anecdotal evidence, SE could have provided survey evidence of actual confusion to attempt to meet its burden.  However,  SE likewise failed to present survey evidence, again despite having ample time to obtain it.  Clearwire launched its campaign using the CLEAR C Mark in Atlanta, where SE is headquartered, in June 2009.  Moony Decl. ¶ 7; Mot. at pg. 4.  Even if it were plausible that SE missed this campaign in its own home town, by its own admission, SE knew of the CLEAR C Mark in late 2009.  Mem. at 2.  Therefore, at a minimum SE has had over a year to conduct a survey as to whether consumers confused the two marks.  Notwithstanding the time and resources available to it, SE failed to present any survey.  This Court may find SE's short-coming creates an inference that a survey would create unfavorable results.  See e.g., Eagle Snack, 625 F. Supp. at 583.

Because SE lacks any evidence of actual confusion, it attempts to underplay the significance of this paramount factor by claiming that evidence of actual confusion is not necessary to show likelihood of confusion.  Mem. at 26.  While it is true that there may be a factual scenarios where the other factors weigh so heavily in favor of likelihood of confusion that evidence of actual confusion is not necessary – this dispute is not one of them.  To the contrary, SE's inability to overcome its burden with respect to the other likelihood of confusion factors renders evidence of actual confusion  critical rather than irrelevant.

SE also argues that a survey is not necessary to prove likelihood of confusion. [17] Mem. at 26.  This argument conveniently ignores that a survey is not necessary *if there is other evidence to show likelihood of confusion*.  See Charles Jacquin Et Cie v. Destileria Serrales, Inc., 921 F.2d 467, 476 (3rd Cir. 1990) (consumer surveys are useful, but not necessary when other evidence exists).  To the contrary, where, as in this case, the evidence of likelihood of confusion is not "overwhelming," a survey becomes more important.  Brown, 744 F. Supp. at 470.  The Fourth Circuit case cited by SE for the proposition that a survey is not necessary, Tools USA, does nothing to undermine these propositions.  Mem. at 26.  Rather, in that case the court affirmed an

---

[17] The real reason that SE argues that neither actual confusion nor a survey is necessary is that it lack both.

injunction granted without a survey where the plaintiff provided substantial anecdotal evidence of actual confusion. Tools USA, 87 F.3d at 660.

In this dispute, SE comes before this Court with two empty hands – one lacks evidence of actual confusion and the other lacks any survey indicating confusion. Accordingly, this factor also weighs heavily in Clearwire's favor because there is no evidence of actual confusion.

e. Confusion Is Unlikely Because Sophisticated Mobile Phone Consumers Take Reasonable Care in Choosing What Products to Purchase.

In determining likelihood of confusion, courts also consider the sophistication and knowledge of typical customers purchasing the types of services and products at issue in this case. See, e.g., Perini, 915 F.2d at 127-28 (reversing district court's summary judgment ruling because the court failed to consider consumer sophistication). SE admits that it is primarily concerned with potential buyers of its products and alleges potential confusion with respect to very specific products – its phones and some non-existent phone to be sold by Clearwire. Mem. at 15. As a result, "the relevant market here is not the public at-large, but only potential buyers of [plaintiff's] products, whose sophistication, therefore, is a factor in the Court's analysis." Rosetta Stone Ltd. v. Google, Inc., 730 F. Supp. 2d 531 (E.D. Va. 2010). Such sophistication may be shown by direct evidence, including expert opinions or surveys, but may also be established by the Court based solely on the nature of the products at issue or their price. Id.

Neither the products sold by SE, nor the mobile broadband services sold by Clearwire are impulse buys or "low cost shelf goods." The typical consumers of such products and services take reasonable care in their decision and commit some time or thought in distinguishing between phone manufacturers and service providers prior to purchase, decreasing the likelihood of confusion. See Rosetta Stone ("These same consumers who are willing to spend hundreds of dollars on … software would reasonably take care in making such a decision."). SE would have this Court believe that consumers do not know what type of smart phone they are buying – whether it is a Blackberry, or an iPhone, or an Android. That is simply improbable. Consumers

of smart phones take reasonable care in their decision of what several hundred dollar smart phone they purchase. Therefore, this factor weighs against likelihood of confusion.

f. The Remaining Likelihood of Confusion Factors Do Not Tip the Scale in SE's Favor to Create Likelihood of Success on the Merits.

Not all of the enumerated factors regarding the likelihood of confusion are of equal importance, nor will they all always be relevant. George & Co., 575 F.3d at 393. While factors like strength of mark and actual confusion are considered of paramount importance, other factors are accorded far less weight. In George & Co., the Fourth Circuit found that factors relating to similarity of the goods or services that the marks identify, similarity of the facilities used by the markholders, and similarity of advertising used by the markholders, all weighed in favor of likelihood of confusion. Id. at 397. Despite these factors favoring the plaintiff, the George & Co. court held that no evidence of the most significant factor, actual confusion, "along with the weakness of the [plaintiff's] mark, the lack of similarity between the two marks, and the lack of predatory intent leads to the inescapable conclusion that there is no likelihood of confusion as a matter of law" between plaintiff's and defendant's marks. Id. at 399. Likewise in the present case, the factors of similarity of goods/services, facilities, and advertising are insufficient to create a finding of likelihood of confusion when the most critical factors regarding actual confusion, strength, similarity, and intent all weigh heavily against likelihood of confusion.

C. There Will Be No Harm to SE – Irreparable or Otherwise.

In trademark cases, there is no presumption of irreparable harm if the plaintiff fails to establish a likelihood of confusion. Int'l Jensen, Inc. v. Metrosound U.S.A. Inc., 4 F.3d 819, 827 (9th Cir. 1993). SE failed to establish a likelihood of confusion; hence, it has not demonstrated that it will be irreparably harmed by use of the CLEAR C Mark. SE provides no other reasons outside of likelihood of confusion as to how it could be harmed, irreparably or otherwise. Rather, SE solely relies upon its faulty proposition that it will succeed on the merits of a trademark infringement claim. Since SE does not demonstrate irreparable harm, it fails to meet this element necessary to obtain a preliminary injunction.

Moreover, the facts that Clearwire has been using its CLEAR C Mark for over 2 years, and SE lacks a single shred of evidence of actual harm, establish that there is no harm, and far less irreparable harm, to SE by Clearwire's continued use of its CLEAR C Mark.[18]

D. The Balance of Equities Strongly Tips in Clearwire's Favor.

SE's argument that the balance of equities tips decidedly in its favor is likewise predicated on layers of assertions for which it has no evidence to support. SE claims that its "demonstration" that it will suffer irreparable harm, which is based only on its ability to prove likelihood of confusion, causes the balance of equities to tip in its favor. Since SE cannot prove either of these foundational claims, its argument falls like a house of cards. While SE has not established any hardship it will suffer if Clearwire continues to use the CLEAR C Mark, the harm that would be suffered by Clearwire by a preliminary injunction would be substantial. In fact, as stated above, SE's own brief recognized the tremendous scope of Clearwire's marketing efforts. Mem. at 8-10. Unlike, SE, which has lost 60% of its market share in two years (Carreiro Decl. Exs. C-D), Clearwire is a growing business (Mem. at 9-10), and any disruption in its ongoing marketing efforts would be devastating.

A preliminary injunction would force Clearwire to immediately cease use of the non-infringing CLEAR C Mark, which will result in an immediate $8 million cost to Clearwire.[19] Moony Decl. ¶ 16. Moreover, ceasing to use the CLEAR C Mark will nullify the goodwill and recognition that Clearwire has garnered in spending hundreds of millions of dollars years ago when it first launched the CLEAR C Mark. Id. at ¶ 17; see also Walker Decl., ¶ 6. This potential harm to Clearwire cannot be called "self-inflicted" in light of the factors for likelihood

---

[18] The focal point of SE's irreparable injury is based upon the creation of a non-existent smart phone by Clearwire. While SE admits that Clearwire announced in November of last year that it had altered its plan and would not be marketing a smart phone (Mem. at 9), nevertheless SE argues at great length about the harm it will suffer from this "straw phone". Lest there be any doubt, Clearwire has ***no*** present plan to market a smart phone.

[19] Consistent with this, Clearwire notes that SE conveniently does not discuss the requirement of Rule 65 that security be posted. However, in this instance, to force Clearwire to spend such monies, which it does not have, based upon the deficiency of SE's proof, would be simply unjust and unfair.

of confusion stacking so strongly against infringement. Accordingly, this Court should deny SE's motion for preliminary injunction because it also fails to satisfy this requirement.

E. There Is No Public Interest in Granting the Injunction.

If there is no likelihood of confusion among consumers, there is no public interest in granting the injunction. Int'l Jensen, 4 F.3d at 827. For this reason alone, SE fails to satisfy the public interest requirement. And while "[t]he public interest favors the protection of valid trademark rights against infringement" (H. Jay Spiegel & Assocs., P.C. v. Spiegel, 652 F. Supp. 2d 630, 638 (E.D. Va. 2008)), here there is no infringement of a valid trademark. Because there is no public interest in granting an injunction against Clearwire's use of its CLEAR C Mark, this Court should deny SE's motion for preliminary injunction.

**CONCLUSION**

As demonstrated herein, SE has failed to present this Court with sufficient evidence to support its request for the extraordinary relief of a preliminary injunction. Moreover, Clearwire submits that the evidence that will be developed in this dispute will never support SE's request for injunctive relief. Therefore, Clearwire request that SE's motion should be denied and this Court should set an expedited hearing on SE's claim for a permanent injunction so that Clearwire may more promptly rid itself of this baseless, yet costly, litigation.

Respectfully submitted,

Dated: January 31, 2011

By: /s/

Daron T. Carreiro (VSB #74743)

PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street NW
Washington, D.C. 20037
Tel: (202) 663-8000
Fax: (202) 663-8007
Email: daron.carreiro@pillsburylaw.com

Mark D. Litvack (*pro hac admission pending*)

Mariah L. Brandt (*pro hac admission pending*)
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA  90017-5406
Tel:    (213) 488-7100
Fax:    (213) 226-4018
Email: mark.litvack@pillsburylaw.com
         mariah.brandt@pillsburylaw.com

*Counsel for Defendants Clearwire Corporation and
Clearwire Communications LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of January, 2011, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of filing (NEF) to all attorneys registered to receive NEF's in this case.

And I hereby certify that I will hand deliver the document to the following:

Roger Anthony Colaizzi
Christopher Scott Crook
Venable LLP
575 7th St NW
Washington, D.C. 20004-1601
Tel: (202) 344-4000
Fax: (202) 344-8300
Email: racolaizzi@venable.com
cscrook@venable.com

/s/
Daron T. Carreiro (VSB #74743)
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street NW
Washington, D.C. 20037
Tel: (202) 663-8000
Fax: (202) 663-8007
Email: daron.carreiro@pillsburylaw.com
*Counsel for Defendants Clearwire Corporation and Clearwire Communications LLC*