UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION
_____

SONY ERICSSON MOBILE            )
COMMUNICATIONS AB, *et al.*,     )
                                )  Docket No. 1:11-cv-48
          Plaintiffs,           )  Alexandria, Virginia
                                )
          v.                    )
                                )  February 11, 2011
CLEARWIRE CORPORATION,          )  10:00 a.m.
*et al.*,                       )
                                )
          Defendants.           )
_____


TRANSCRIPT OF HEARING

BEFORE THE HONORABLE CLAUDE M. HILTON

UNITED STATES DISTRICT JUDGE






APPEARANCES:

  For the Plaintiffs:    Roger A. Colaizzi, Esq.
                         Damon W. D. Wright, Esq.

  For the Defendants:    Mark D. Litvack, Esq.
                         Daron T. Carreiro, Esq.

  Court Reporter:        Tracy L. Westfall, RPR, CMRS, CCR


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1                   P R O C E E D I N G S

2          THE CLERK:  Civil Action 2011-48, *Sony Ericsson Mobile*

3  *Communications, at al. v. Clearwire Corporation, et al.*

4          MR. COLAIZZI:  Good morning, Your Honor.  Roger

5  Colaizzi with the Venable firm for Sony Ericsson AB and Ericsson

6  USA.

7          THE COURT:  Good morning.

8          MR. LITVACK:  Good morning, Your Honor.  Mark Litvack

9  and Daron Carreiro of Pillsbury for the defendants.

10          THE COURT:  Good morning.  With me today is Damon

11  Wright, also with the Venable firm, and Justin Pierce, counsel

12  with Sony Ericsson.

13          Your Honor, this is Sony Ericsson's request for a

14  preliminary injunction enjoining defendants from using logos and

15  infringe Sony Ericsson's mark.  Your Honor, like many trademark

16  cases, this case involves two companies, one an established

17  company, Sony Ericsson, and one a newcomer, which is the

18  Clearwire defendants.

19          Sony Ericsson manufactures and sells cell phones and

20  smartphones, phones that can be used to access the Internet

21  worldwide.  They've been selling and manufacturing phones since

22  2001, the last ten years.  They are considered one of the top

23  five manufacturers of these phones in the world.

24          They've sold, just in the United States, more than 32

25  million phones.  Each and every one of those 32 million phones,

1   Your Honor, has this, Sony Ericsson's registered trademark,

2   which is this one on the left here.  There's no other company,

3   no other company in the world that uses a sphere with the green

4   and the silver-gray chrome colors on cell phones.

5       Clearwire is a startup company, and they offer a

6   service called 4G.  It's a -- it deals with speed and it's a

7   service that allows smartphone and computer users to access the

8   Internet.  Clearwire has announced that they intend to launch a

9   smartphone and that they're going to put their mark on it.  This

10  is their mark here in the middle.  The one on the right, Your

11  Honor, is also a Sony Ericsson registered trademark.

12      Defendants say that they will compete with companies

13  like Verizon Wireless, AT&T, T-Mobile, Sprint, and those

14  companies do two things.  They offer the same 4G access to the

15  Internet, that same speed.  Importantly, they didn't offer that

16  until about a month or two ago.  Now each of them offer the 4G

17  just like Clear does.  They have one advantage over Clear, and

18  that's that they also offer smartphones along with their

19  service.  Clear doesn't do that, but they have indicated they

20  intend to do that.

21      Now, they've been using this logo for the last few

22  months on and off.  They've been given a chance to stop using

23  it.  They are continuing to use it and they're using it now, and

24  of course, they want to use it on these smartphones.  The

25  defendants are the only other mobile communications company that

1   uses a sphere, that uses a sphere with Sony Ericsson's exact

2   colors, the green gradients and the silver chrome and gray.  In

3   fact, you can see it's highly similar with the highlights, the

4   accents.  It even looks like the light is coming from the same

5   angle almost, as if whoever designed it was sitting there

6   looking at the Sony Ericsson registered trademarks.

7         Your Honor, for us to succeed on a preliminary

8   injunction here today, we obviously have to show a likelihood of

9   success on the merits.  In order to do that in a trademark case,

10  I have the burden today to show that we have a valid and

11  enforceable mark, that the defendants' mark is infringing, and

12  there's a likelihood of confusion.

13        To show the likelihood of confusion, the Court will

14  consider factors as laid out in *Pizzeria Uno* or *Sara Lee*.  Your

15  Honor, first of all, Sony Ericsson does have a valid and

16  enforceable mark.  That's presumed by dint of the registration.

17  When we look at the strength of the mark, one of the first

18  factors to consider -- two very important points to make.  One

19  is that the mark is conceptually strong, which means that it's

20  inherently distinctive, and on the well-known distinctiveness

21  scale, the Sony Ericsson mark is considered a fanciful mark.

22        It's as strong a mark as a company could ever get.

23  It's fanciful because it doesn't mean anything.  It's not

24  suggestive, it's not descriptive, it's not generic.  It's a

25  completely made-up thing.  It's also highly enhanced.  It's a

1   sphere.  It's got the swirls.  It's got all kinds of shading and

2   it's got different colors.  So there's a presumption of validity

3   and protectability.

4        The mark is also commercially strong.  That's

5   evidenced, Your Honor, by first that the mark is used on every

6   single one of the phones manufactured by Sony Ericsson which is

7   one of the top five phone manufacturers in the world.  It's on

8   every one of those 32 million phones that have been sold in the

9   United States.  It has been doing this exclusively for ten years

10  now.  Your Honor, there's been millions of dollars of

11  advertising done using this Sony Ericsson registered trademark.

12  Just in 2009 alone, $26 million.

13        It's been long associated with a well-known tennis

14  tournament, and from that there's been a tremendous amount of

15  unsolicited media which of course shows the mark.  There's also

16  been a lot of media with respect to the analysis of the Sony

17  Ericsson phones and what's new on it and what's great about

18  their smartphones.  They've won a number of awards.  So there's

19  a lot of commercial strengths to this mark.

20        Your Honor, the marks, the second factor is the marks

21  are substantially strikingly similar.  I look at this chart, and

22  you can see the mark in the middle, it's got every single

23  feature that the Sony Ericsson registered mark has.  It's a

24  sphere, as the Sony Ericsson is.  It's got the silver chrome and

25  gray like Sony Ericsson has in the swirl.  It's got the same

1   green and the gradients of green.  It's got the same highlights.

2   It's shiny.  It's got the same angle of reflection.  So I think

3   it's pretty hard to keep a straight face and say, well, these

4   marks aren't similar.

5       Your Honor, the goods are similar, the next factor.

6   Defendants sell mobile communication devices and services.  Sony

7   Ericsson sells mobile communication devices, particularly

8   phones.  And while defendants want to sell phones, it would be

9   the identical product.  They also sell complementary products.

10  These products serve the same purpose.  They access the

11  Internet.  In fact, many phones coming out now serve the purpose

12  of what Clearwire's other devices do.  They become mobile

13  hotspots so you can access the Internet with your computer

14  through your smartphone.

15      The *Synergistic* case, Your Honor, points out that where

16  you have products that go hand-in-hand, like we have here,

17  they're particularly vulnerable to confusion.  So you can assume

18  an association where none exists because of that hand-in-hand

19  aspect, and that's what cases here in the Fourth Circuit have

20  held.

21      The next factor, they're in the same channels of trade.

22  There's no dispute over that.  The phones are -- the Sony

23  Ericsson phones with their registered mark are sold side by side

24  to Clearwire's products and services.  They're in the same

25  stores, the big box stores like Best Buy and Radio Shack.

1   Clearwire has kiosks in malls.  Sony Ericsson's phones are sold

2   in AT&T kiosks in malls.  In fact, every mall that Clearwire has

3   gone in, there is a Sony Ericsson kiosk or store that -- I'm

4   sorry -- Sony Ericsson store or kiosk that sells Sony Ericsson

5   phones with the registered mark on it and also has the

6   advertising for it.

7        Your Honor, the next factor, the same channels of

8   advertising.  You will find Clearwire advertised on TV, the

9   Internet, in print, just like Sony Ericsson's phones and marks

10  are advertised on television, Internet, and in print.

11       Your Honor, the next factor is intent to copy.  This

12  factor is very important.  The Fourth Circuit actually presumes

13  that one who sets out to infringe has more brains than scruple

14  and is likely to succeed.  This is one of those cases where the

15  intent is pretty clear.  Frankly, Your Honor, I think a

16  presumption of predatory intent can be had here.

17       Your Honor, I'm holding up a chart.  I want to show you

18  kind of the progression of how defendants got to this mark where

19  they -- that we're challenging and we want to be enjoined today.

20       Back in 2009, Sony Ericsson became aware of this mark

21  far on the left.  It's a silver-chrome sphere with this green

22  swirl, the same colors that Sony Ericsson has in its registered

23  trademark.  Upon learning of this -- there was a watch service

24  on the PTO that they're alerted that someone's got a similar

25  mark -- they quickly and swiftly opposed that mark at the Patent

1    and Trademark Office.   Ultimately, defendants agreed never to

2    use that mark again and they agreed to expressly abandon their

3    trademark application.   In exchange, Sony Ericsson agreed to

4    drop its opposition proceedings.

5         Sony Ericsson also became aware of these next two

6    marks, these two green marks in the middle, and talked with

7    defendants and said, hey, you've got to stop using those marks.

8    Just like this inverse mark that you have of the colors, these

9    two marks are spheres, they have the same colors, the same

10   gradient.   They've got some highlight.   They've got the gray

11   that you can see clearly.   They look substantially strikingly

12   similar to Sony Ericsson's mark and we want you to stop using

13   those.

14        The defendant said they'll come up with a new mark.

15   Your Honor, they did come up with a new mark.   It's this mark

16   here.   They took every feature that Sony Ericsson said, hey, we

17   don't want you to do this, we want you to go away from that

18   aspect of it, and they enhanced every feature that Sony Ericsson

19   complained about.   There's no mistake here.   There's no

20   happenstance that they came upon this mark and, oh, look, I

21   didn't know about Sony Ericsson's mark.   There were direct

22   discussions about this.   Sony Ericsson was saying don't do it,

23   and they turned around and did exactly the opposite and went

24   directly towards the mark.

25        This mark, Your Honor, they launched in October of

1    2010.  They didn't -- they didn't tell Sony Ericsson they were

2    going to launch it.  They were -- Sony Ericsson was expecting to

3    see something that was completely different, perhaps more like

4    the marks that they use on their products that look -- that

5    don't look like these marks, but instead they just launched this

6    mark and went full force ahead.

7         Your Honor, the other factors, for example, the quality

8    of their products, there have been many complaints about their

9    products.  So there is a fear that Sony Ericsson will be harmed

10   because someone will think that a Clear product is associated

11   with Sony Ericsson and that will ruin the goodwill and the

12   reputation of Sony Ericsson.

13        There's a solid case of likelihood of confusion here,

14   Your Honor, and almost all of the factors considered in a

15   likelihood of confusion analysis weighs in plaintiffs' favor.

16   So if I address the arguments that defendants made, they have

17   effectively three arguments.  The first argument is, hey, I

18   don't see any anecdotal evidence of actual confusion and there's

19   no survey, and without either of those, there's no way you can

20   prove likelihood of confusion.

21        Well, Your Honor, this court has made clear that you

22   don't need evidence of anecdotal actual confusion.  You don't

23   need to have a survey to show likelihood of confusion.  In fact,

24   this court in *Synergistic* found -- granted an injunction on a

25   summary judgment where there was no evidence of actual

1    confusion or anecdotes of actual confusion and there was no

2    survey.

3           In fact, there was another factor that was missing in

4    *Synergistic*, and that was the intent factor.  Here you have a

5    very strong, almost presumptive intent here based upon

6    defendants' conduct.  So this is even a stronger case than that

7    *Synergistic* case where an injunction was found, on summary

8    judgment even, without actual confusion or a survey.

9           The cases are clear that neither is needed.  The cases

10   are clear that while if you had it, it would be strong evidence

11   of likelihood of confusion, but the inverse does not hold; that

12   is, if you don't happen to have anecdotal actual confusion,

13   that's not weighted against the defendant -- I'm sorry -- the

14   plaintiff.

15          Your Honor, I would also say that I think we are likely

16   to find many instances of actual confusion when we get to

17   discovery in this case because right now we have kiosks that are

18   controlled by Clearwire, their own retail stores.  When people

19   come in looking for Sony Ericsson products or phones, I don't

20   think any of their employees are writing down, hey, somebody

21   came in looking for a Sony Ericsson.  Likewise, the Best Buys, I

22   don't think the clerks at these big box stores are taking the

23   time to keep track of that.

24          I think we're likely to find it for two reasons.  One,

25   this mark has only been used in the last couple of months.  Two,

1    Clearwire has really only started to come into its own in the

2    last maybe four or five months where they've started to get more

3    coverage across the country and have now really hit their stride

4    in terms of getting out there in the marketplace.  Those two

5    factors together are a big circumstance where we would see some

6    actual confusion.  In addition to that, if Clearwire's permitted

7    to put, effectively, Sony Ericsson's registered mark on their

8    phones, it's going to be rampant actual confusion, Your Honor.

9         Defendants also say that we need to show secondary

10   meaning by a survey.  Of course, it's pretty clear, and there's

11   a legion of cases on point, that when you have a fanciful,

12   inherently distinctive mark, there's no requirement to show

13   secondary meaning.  Secondary meaning requirements are reserved

14   for descriptive marks like proper names and other types of

15   descriptive marks.  So, of course, a survey that shows secondary

16   meaning is not at all required.

17        Your Honor, the second argument defendants make, it's

18   kind of interesting.  They say that there's so many spheres,

19   logo spheres in the world that, you know, there really can't be

20   a likelihood of confusion because, well, it's just one more

21   sphere.

22        I want to put up, Your Honor, the defendants' exhibit.

23   I want to put up the defendants' exhibit, which is on the left

24   here.  This is a chart of 60 world recognizable sphere logos

25   around the world.  It's nice that Sony Ericsson is in there

1   being acknowledged as one of the world's 60 most recognizable

2   spheres, but the important thing about this is that when you

3   look at this and you say, all right, well, that's a lot of

4   spheres.   Maybe I can see defendants' point, but if you look a

5   little closer you see, well, there's a Magic 8-Ball, there's a

6   soccer team, there's a music company.   You realize, well, wait a

7   minute.   58 of these spheres have absolutely nothing to do with

8   this case.   They're not in the mobile communications market.

9   They're not seen in the same channels of trade.   They're not

10  seen in the same channels of advertising.   This has nothing to

11  do with that case.

12          When you take away the 58 that have nothing to do with

13  mobile communications, you end up with two logos, Sony

14  Ericsson's green sphere with the chrome-silver accent swirl and

15  you have AT&T's blue and white striped sphere.   Interestingly

16  enough, AT&T is partners with Sony Ericsson in providing the

17  service for Sony Ericsson phones.   Frankly, you can take away

18  the AT&T sphere because it looks absolutely nothing like Sony

19  Ericsson's sphere.

20          When you get to the last panel here, Your Honor, if you

21  add Clearwire, defendants' sphere, you can see that the only two

22  spheres with green and chrome/gray/silver color are defendants'

23  sphere, which they want to put on phones, just like Sony

24  Ericsson's registered mark which is already on more than 32

25  million phones.   So this exhibit of the 60 logos doesn't help

```
 1   defendants at all.  In fact, it help plaintiffs and it
 2   highlights really the weakness of defendants' case.
 3        The third argument, which, Your Honor, I don't think
 4   this argument is believable at all, is that, you know, we really
 5   just picked our mark because it was the only color that was far
 6   away from all our competitors on the color wheel.  They attach a
 7   color wheel to their papers.
 8        This color wheel, Your Honor, they have here, they have
 9   the four service providers they compete with: AT&T, T-Mobile,
10   Verizon, and Sprint.  Those are the top four they say.  What
11   they didn't do is they didn't put the phone providers.  They
12   identify who the top five phone manufacturers in the world are.
13   So we put those on their chart.  That's Nokia, Samsung, LG,
14   Motorola, and of course, Sony Ericsson.
15        Now, the reason it's appropriate to put those on this
16   color wheel is there's absolutely no possibility the defendants
17   didn't know about Sony Ericsson and they didn't know that they
18   were selling their service and products right next to Sony
19   Ericsson.  They know full well about Sony Ericsson, and they
20   knew about their registered trademark.  Instead of picking the
21   color that was somewhere not near Sony Ericsson's, they went
22   right on top of Sony Ericsson to benefit from the reputation and
23   goodwill of Sony Ericsson.
24        Your Honor, I want to make a couple of points about
25   irreparable harm.  First of all, cases show that a showing of
```

1  likelihood of confusion results in a presumption of irreparable

2  harm.  Sony Ericsson has presented a very strong case of

3  likelihood of confusion and is certainly entitled to the

4  presumption of irreparable harm.

5         In addition, Your Honor, we also have evidence of

6  irreparable harm, and I can demonstrate that really through

7  looking at a growth chart of defendants launching out into the

8  market.  What we have here, Your Honor, is -- I'm going to put

9  it up there.  I know it might be hard to read from the bench,

10  but I'll describe it to you.

11         When they launched in January of 2009 -- remember, in

12  their papers defendants said, well, you know, we've been doing

13  this for two years and, you know, there should be just tons of

14  actual confusion.  Well, the fact of the matter is two years ago

15  they were in one city and one state, Washington State.  Eight

16  months later, they were in three states and three cities.  By

17  the time they got to the end of 2009, they were able to get into

18  11 states.  Then by April of 2010, I think they added one more

19  city, but they still were only in 11 states.  In fact, it

20  indicates only one city added in that next four-month period.

21         Your Honor, in May they announced by press release that

22  they're going to launch some smartphones and they're going to

23  put their logo on it.  In May, the period May through August of

24  2010, they were able to go from 11 states to 20 states with a

25  lot more cities.  In the last four months of 2010, they

 1   increased to 28 states.

 2          So you see, Your Honor, in the last few months of 2010,

 3   they really hit their stride.  So the more they get out in the

 4   market, and particularly if they're going to put this infringing

 5   logo on their smartphones, the more we're going to see harm to

 6   Sony Ericsson and the more likelihood there's going to be harm

 7   and the more likelihood that Sony Ericsson is going to lose

 8   market share.  That is evidence of irreparable harm to Sony

 9   Ericsson.

10          Your Honor, I would show you that these -- for them to

11   put the mark on the phone looks something like this.  You have

12   the Sony Ericsson phone on the left.  Xperia happens to be what

13   they're calling this particular phone.  You see the sphere with

14   the silver swirl.

15          Over here is a mockup of what we would expect the Clear

16   phone to look like, logo in a similar spot, looks the same.

17   They have the word Clear next to it.  Of course, in many

18   respects that's a descriptive word.  And when you're using a

19   cell phone, Your Honor, one of the things you want is clear

20   connection, clear service.  Nobody likes to get dropped calls.

21          To the extent that somebody sees that, they might

22   think, well, that's what they're calling the phone.  They're

23   calling it the Clear just like they call it the Xperia; or if

24   they happen to know about Clearwire, they would think, well,

25   Clearwire and Sony Ericsson are associated and they're working

1    together so this is a Sony Ericsson phone with the Clearwire

2    service.

3         When those people get home and start using that phone

4    and it's not working to their satisfaction, there are problems

5    with it like they've had some problems with some of their other

6    devices, that really irreparably harms Sony Ericsson, harm that

7    can't be remedied through just a payment of money.  They lose

8    customers for life, they lose their goodwill, they lose their

9    reputation.  There will be articles about it.  It's a horrible

10   situation if defendants are able to put the infringing logo on

11   their phones.

12        THE COURT:  What is this alleging infringing logo on

13   now?

14        MR. COLAIZZI:  Your Honor, the logo right now is on

15   advertising.  You'll see it in their television ads.  You'll see

16   it in their print ads.  You'll see it on the Internet.  It's

17   also on their retail packaging, but it's not on their actual

18   physical product.  Let me show you the difference.

19        On their physical product, Your Honor, what they've

20   used all along and they're using to this day are these other

21   marks where you see this fluorescent green with black, or you'll

22   see this gray with white, or you'll see a gray and black or a

23   black and white.  You don't see the sphere with the green

24   gradient and the silver-gray chrome color at all.

25        These are two-dimensional marks.  They're not made like

1    a sphere.  They're just flat and they look flat when you look at

2    it.  When you look at the mark they're using now, it's clearly

3    globe or sphere shaped and it's got the exact color combination.

4    Defendants are well aware that that's Sony Ericsson's color

5    combination.  There's no mistake there.

6          So you don't have it on their physical product.  You

7    certainly don't have it on their phones yet because they haven't

8    launched them, but you do have it in their advertising and you

9    have it on their retail packaging.  There's signage where, if

10   you go to a kiosk, there might be a table with a blanket over

11   it.  They have some poster boards.  They have some signage, but

12   it's not expensive signage.  Kiosk-type signage, Your Honor.

13         That really takes me to the harm that would really

14   affect defendants if an injunction were granted.  We know that

15   if an injunction were granted against their use of the logo on

16   smartphones, there's no harm to them whatsoever.

17         First, they're claiming that they have no present

18   intention -- no present plan, not intention, no present plan to

19   launch smartphones.  They don't say we're not going to do it.

20   They don't say we're never going to do it.  In fact, if they

21   really were not going to do it, that wouldn't moot the -- even

22   if they said those things, and they haven't, that would not moot

23   the appropriateness of an injunction.

24         In order to moot or to block a preliminary injunction

25   when an infringing mark is going to be used on a product, they

1   have to convince the Court that there's no reasonable

2   expectation that this wrong will be repeated or that this

3   infringing mark will be put on phones.

4         THE COURT:  Well, if they say they're not going to put

5   it on the phones, what reasonable expectation can I have that

6   they're going to put it on there?  Just because a competitor's

7   telling me that they may?

8         MR. COLAIZZI:  Well, it's not just a competitor telling

9   you, Your Honor.  First of all, they didn't say that.  They

10  didn't say we're not going to put it on phones.  They said we

11  don't have a present plan to do it.

12        If you look at their press releases, and more

13  importantly, if you look at their SEC 10-Q filings, they don't

14  say we're not going to put it on a phone because that would be

15  commercial suicide.  Their four biggest competitors have phones.

16  They need a smartphone.

17        So in their SEC 10-Q filings they say, well, we're

18  short on cash, we're strapped right now, we're trying to raise

19  money, and we're going to delay -- the word they use is delay --

20  we're going to delay our plan to launch the smartphones.  That's

21  the premise that they say we don't have a present plan to do it.

22  They have every intention of launching a smartphone and putting

23  their logo on it, Your Honor.

24        THE COURT:  All right.  I understand your position.

25  Let me hear from the other side.

1          MR. COLAIZZI:  Yes, Your Honor.

2          MR. LITVACK:  Good morning, Your Honor.

3          Your Honor, I would like to start, we filed a motion to

4    strike.  This court has held that we should raise that issue at

5    this hearing.  I want to make sure the record's clear.  I don't

6    know if the Court has had the opportunity to see that.  Based

7    upon the evidence submitted by Sony Ericsson in their reply

8    brief regarding what we consider to be 408 settlement

9    conversations and new evidence submitted in their reply brief,

10   so I just want to make sure that record is clear.

11         THE COURT:  All right.  You can go ahead and address

12   that if you want to.

13         MR. LITVACK:  Well, and it was discussed here at that

14   time, Your Honor, as he talks about the settlement discussions

15   go back and forth.  There is a letter agreement that's in the

16   reply brief that on its face says that it is a 408 settlement

17   communication.

18         It is for the first time -- what we have, Your Honor --

19   let me take you back a step and see how it comes in.

20         Plaintiffs made this motion.  In our response we

21   pointed out the key facts that they do not have any evidence of

22   the strength of their mark.  That goes to secondary meaning or

23   whether anyone recognizes the mark.

24         The Fourth Circuit has held in *Perini* that if no one

25   recognizes your mark, there can be no improper association with

1    that mark.  In fact, *Perini* says you can have an identical mark,

2    but if there is no strength in that mark, that can be no

3    confusion.

4         Here we do not have identical marks.  The law of this

5    circuit is that you need to show secondary meaning and strength

6    so there can be some sense of an association between the two.

7    In fact, Your Honor, these marks are not shown this way in the

8    marketplace as we point out to you.  They're always shown with

9    the words -- their marks with the words Sony Ericsson.

10        So having pointed out that they lack said evidence,

11   what plaintiffs in the reply brief said, they say, well, we have

12   this settlement agreement.  This settlement agreement in some

13   way recognizes the strength in our mark.

14        Two things, Your Honor.  First, it does no such thing.

15   It's an improper interpretation.  In fact, all it says really is

16   a mark that we had determined to give up that we were not going

17   to use.  Specifically, it never says anything along the lines

18   that we recognize the strength in their mark.

19        Secondly, and most importantly, is the reason it should

20   be excluded.  One, it was new evidence not introduced in the

21   moving papers.  This court's local rule, 7.1(f), specifically

22   does not allow for new evidence to be placed in a reply brief.

23   More importantly, on its face the agreement says this is a

24   settlement communication under 408.  It says its without

25   prejudice.  Hence, to bring it in for the very purpose of

1  somehow saying we admitted anything in it is to go against the

2  very purpose of what every court has said the purpose of 408 is;

3  that is, to allow parties to have active and fruitful settlement

4  discussions.

5        Let me go -- if I can go back to the merits of the case

6  itself.  Let me deal with where they ended, and that is on

7  smartphones.  One of the problems we have here, Your Honor, is

8  the lack of evidence in plaintiffs' papers.  Mr. Colaizzi makes

9  statements to you, Your Honor, that with all due respect are

10 fundamentally untrue.  He says in our press release we are going

11 to issue smartphones with the logo on it.

12       Your Honor, there is a May communication that says we

13 intend to go into smartphones.  Nowhere does it mention the

14 logo.  He says in November we stopped it.  That is true.  He

15 says -- if I can borrow his chart, Your Honor -- he tells this

16 court, once again, only based on plaintiffs' argument, that

17 these are the only two marks in the mobile communications area.

18 That's not true.  It's not right.

19       Alcatel-Lucent, whose very website says welcome to the

20 future of wireless broadband, their mark is on this chart.

21 Mobile Communications, their mark is on this chart.  BT, have

22 you got my new number? their phone, their mark is on this chart.

23       What we have here, Your Honor, when we stop -- when we

24 replace real evidence with counsel argument, we get into

25 problems because it does not allow us the chance -- I mean, I

1   can point to the Court here, but what this court needs to see is

2   real evidence and what it does not have is real evidence.   Why

3   is the survey needed?   Because a survey is needed and surveys

4   are admitted in numerous trademark cases because they indicate

5   one of two things.   They indicate a real likelihood of confusion

6   and they are a substitute for actual confusion.

7           What plaintiffs admit in one of their complaints is

8   we've shown this mark to tens of millions of people and they

9   have zero anecdotal evidence.   Is it required?   No.   Is it

10  evidence that there's a lack of likelihood of confusion?   Yes,

11  there is.   This court last year said there can be no greater

12  test of likelihood than actual, especially here when you have

13  millions of people having seen the marks.

14          Once again, Mr. Colaizzi comes before you and says I'm

15  sure we'll find evidence, you know, I'm sure we'll find it.

16  Well, that's good.   When he finds it, he can come before this

17  court and present it, but till he finds that evidence, to say

18  there's a presumption that there is that evidence or to make

19  believe there is that evidence, there's no basis to do that.

20          Your Honor, he can make a mockup of a phone.   What we

21  have told this court is right now we have no present intention

22  to come out with a phone.   There is no mockup model that I can

23  show you what it looks like.   I don't know.   My businesspeople

24  don't know.

25          Your Honor, case after case in the Fourth Circuit, in

1  the *In re Microsoft* case, which is at 333 F.3d 517, and *Manning*

2  *v. Hunt*, 119 F.3d 254, tells the Court that irreparable injury

3  must be immediate.  It can't be speculative.  Nothing is more

4  speculative than a nonexistent phone.

5       If and when we decide to launch a phone, if they then

6  believe we put a mark on it that they then believe is confusing

7  and they then have some evidence to support that, we can all

8  come back, but until then, with all due respect, we're in make

9  believe land.  This is an imaginary thing we're discussing, an

10  imaginary phone that they have determined that we're going to

11  put a logo on it in 3D in a certain way.

12       Let me get back to when he talks about our colors, if I

13  may.  Mr. Colaizzi showed his color wheel.  Here is the real

14  Sony Ericsson color wheel, Your Honor.  They have registered

15  marks in green, in orange, in this red, in this red, in this

16  purple, in this blue.  Anyplace we went on this sphere they

17  would argue was close to one of their marks.  They may say,

18  well, green's our real color and let's disregard the rest of the

19  marks.

20       Your Honor, last week after we filed our brief, as this

21  court may recall, there was a Super Bowl.  Super Bowl ads are

22  famous, well known, and very expensive.  Sony Ericsson ran a

23  Super Bowl ad.  As I was sitting there watching it, I noticed

24  it.  At the end -- it's a whole ad, it talks about somebody with

25  thumbs and how they use phones -- and they use their mark once

1    at the end of the ad.

2            Here is what it looks like, in that blue color.   There

3    is no green in their Super Bowl ad.   Your Honor, Super Bowl ads,

4    as you're well aware, may cost between two-and-a-half to

5    $3 million, which is effectively 10 percent of the budget they

6    claim to spend a year.   The only mark they advertise, the only

7    time it's shown, these are the words with the blue.

8            Your Honor, another way they advertise is through

9    Facebook, which as you may know is a well-known social

10   networking site.   Very popular, especially amongst younger

11   people who tend to be heavy users of phones and smartphones.

12           If you look at their Facebook ad, here is what they

13   look like on Facebook in this country.   It's purple.   It's not

14   green.   They picked green for this litigation because that's

15   what they have in this litigation.   For them to show you a color

16   wheel and say we picked a color that goes on them, when they

17   basically come around every color in the rainbow, ask for a

18   scope of protection on a mark that there's not any evidence that

19   anyone recognizes outside of the people at their table, and

20   that's where I would like to end, Your Honor.

21           That is, if you look at the evidence this court really

22   has, real evidence, not arguments of counsel, there is no

23   evidence of strength, there is no evidence of secondary

24   confusion, there is no evidence of intent, none.   They didn't

25   depose any of our people.   They have no admissions.   They have

1   nothing that would show we intended to do.  The evidence is

2   there's no actual confusion.  The evidence is that tens of

3   millions of people have seen this and not been confused.  That's

4   the evidence we have.

5          Finally, this court has recognized and the Fourth

6   Circuit has recognized that when you have an intelligent

7   consumer, it can negate any likelihood of confusion between

8   arguably similar marks, which we would submit do not exist here.

9          By the way, Your Honor, it's one of reasons we put the

10  go-to marks in our brief because we wanted you to see that was

11  the one case they relied upon for similarity.  We wanted you to

12  see the marks and how similar they were here on contrast to what

13  exist in this case, and that is, here people don't mistakenly

14  buy smartphones.

15         I happen to own an iPhone.  My cocounsel happens to own

16  a BlackBerry.  My son happens to own a Droid.  We all know what

17  we own.  We don't mistakenly buy an iPhone thinking it's a

18  BlackBerry or an LG phone.  This is a group of intelligent

19  people who, when they buy their phones, know what they're

20  buying.  There's no evidence here that would support that people

21  are confused as they purchase products.

22         Unless the Court has any questions, I thank you.

23         THE COURT:  All right.  I have no questions.

24         Give me about 30 seconds.  I've heard a lot of argument

25  so far.

1          MR. COLAIZZI:  Okay, Your Honor.  Let me point out the

2     two marks that they say are also in this space.  They claim this

3     BT mark, which is way up here, Your Honor.  I don't know if you

4     can see it, but it's the third row down on the left.  We can

5     hand up a binder for you.

6          It's looks nothing at all like -- it looks nothing at

7     all like this green sphere, No. 1.  No. 2, it's not a company

8     that's sells devices like Sony Ericsson does and like Clearwire

9     does.

10          The same holds true for Alcatel-Lucent, which I think

11     is this one here, this purple with kind of a white swirl on it.

12     Looks nothing like it.  If that's the best they can do, Your

13     Honor, it's not very good.

14          They say there's no evidence that anybody recognizes

15     the mark.  Your Honor, the Patent and Trademark Office federally

16     registered the mark.  It's a fanciful mark.  There's no

17     requirement for a survey to show secondary meaning.  That's just

18     plain wrong.  He says there's no greater test of likelihood of

19     confusion than an actual confusion.  While that may be true,

20     it's not required and actual confusion is hard to get.

21          Your Honor, one last thing.  They're saying this phone

22     is imaginary, it's a figment of my imagination, it doesn't exist

23     and they don't have present intent.  They've changed it from

24     present plan to present intent now, but they haven't told all of

25     the investors out there in the world that, hey, it's imaginary.

1   No matter what we say in our 10-Qs, in our press release where

2   we say we're going to delay the Clear-branded phone -- they use

3   those words, the Clear-branded phone, smartphone -- they say

4   it's an imaginary thing.

5          Finally, Your Honor, the last thing.  This is the phone

6   that is going to be sold.  It was on in the Super Bowl ad.  As

7   you can see, the Sony Ericsson mark is clearly on that phone.

8   In all of the buzz surrounding this phone and all of the

9   write-ups about how great it's going to be because it has a Sony

10  PlayStation in it, they call it the PlayStation phone, every

11  single unsolicited advertisement -- I'm sorry -- publication

12  writing about it has a picture of the phone with the green mark.

13         THE COURT:  Whose phone -- that's your phone?

14         MR. COLAIZZI:  This is Sony Ericsson's phone that was

15  advertised at the Super Bowl.  It's going to be launched

16  shortly.  There's quite a buzz around it.

17         Your Honor, the fact of the matter is that defendants

18  would say, hey, because you have other registered marks, you

19  can't enforce your green and silver-chrome registered mark.

20  That's just plain wrong, Your Honor.

21         Very quickly on the bond, Your Honor.  If the Court

22  enjoins the use of the infringing logo on smartphones and on

23  their physical devices, that maintains the status quo.  They do

24  nothing except not actively put the infringing mark on those

25  products.  If they don't launch the smartphone, as they indicate

1    to investors they intend to do, then they can't put it on there.

2         If the Court will grant the injunction for enjoining

3    the advertising, the use of it in advertising, that would

4    include their retail boxes and they can easily sticker those.

5    That would include signage that they indicated were basically

6    poster boards like this or blankets or plastic banners and some

7    signage on kiosks, and that would mean they would have to change

8    the Internet.

9         The cost associated with that, Your Honor, would be

10   quite small.  A bond in the amount -- particularly when there's

11   no harm to the defendants here, as there isn't, if that

12   injunction were to be granted.  As you've seen, they have plenty

13   of other marks that they use.  They're not going to have to shut

14   down business by any stretch of the imagination.  I think an

15   appropriate bond would be no more than $500,000, Your Honor.

16        THE COURT:  All right.  Well, obviously with what's

17   been presented to me, if there's presented marks here that look

18   alike and look similar, and perhaps there could be some

19   confusion out there under the right circumstances, but the

20   evidence I have before me is that there's going to be confusion

21   because this is going to be placed on a phone that is about to

22   be produced, and that has prompted the injunction apparently.

23   The evidence is that this particular mark is not being used on

24   the equipment that is out there already.  The phones that were

25   shown to me here have a different mark on them.

1             Now, the only evidence before me then is that this mark

2    is used somehow in advertising and it is used in connection with

3    a booth.  I don't have any evidence before me that would show

4    that there could be any confusion with that kind of a use.  If

5    there is any confusion, I'm not sure it's irreparable harm.

6             This case could go to trial in six months.  What in six

7    months is going to happen that's going to be irreparable that

8    can't be addressed by any damages you've had for any confusion

9    that's been out there with whatever advertising they've done and

10   whatever logos they've had on their booths?

11            I simply don't have in front of me any evidence that

12   would justify a finding of irreparable harm here that would

13   cause the entry of a preliminary injunction.  If the

14   circumstances should change, I would be willing to consider

15   that, but this case, move along quickly and get the issue

16   resolved.

17            MR. COLAIZZI:  If I may, just very briefly.

18            The picture of the products are not phones.  Those are

19   other devices.  They do not presently have a phone.  That's what

20   we're concerned about, that when they launch the phone they'll

21   put that mark on it.

22            THE COURT:  I understand that, but you've shown me that

23   they're not even using this logo that you think is going to be

24   so confusing.  That's not being used out there on their other

25   equipment.

1          You have no evidence that they are going to introduce

2    this phone.   This case may be tried before a phone's introduced.

3    They say they're not going to introduce it.   They don't know

4    when it is.   This case will go to trial before then.   There's

5    just no evidence here that would justify a preliminary

6    injunction.   Your request for a preliminary injunction will be

7    denied.

8          MR. LITVACK:   Thank you, Your Honor.

9          THE COURT:  All right.   Thank you-all.   That takes care

10   of my civil cases.

11         We'll adjourn till Monday morning at 9:30.

12     * * *

13     (Proceedings concluded at 10:49 a.m.)

1                       <u>CERTIFICATION</u>

2

3          I certify, this 13th day of February 2011, that the

4    foregoing is a correct transcript from the record of proceedings

5    in the above-entitled matter to the best of my ability.

6

7                           /s/
                    _____
8                    Tracy Westfall, RPR, CMRS, CCR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25